IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,044






EX PARTE GEORGE EDWARD MCFARLAND, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS 


CAUSE NUMBER 619600-A IN THE 262
ND DISTRICT COURT


FROM HARRIS COUNTY





 O P I N I O N



 Cochran, J., delivered the opinion for a unanimous Court. Womack, J., filed a
concurring opinion, joined by Keller, P.J., and Johnson, J.


 This is an original application for writ of habeas corpus filed pursuant to Article
11.071 of the Texas Code of Criminal Procedure. Applicant was convicted of capital
murder and sentenced to death in August of 1992. This Court affirmed Applicant's
conviction on direct appeal. (1) Applicant alleged twenty-three claims for relief in his original
habeas corpus application filed on May 21, 1997. After an evidentiary hearing, the trial court
entered Findings of Fact and Conclusions of Law and recommended denying relief.

 In his Findings of Fact, the trial judge noted that almost all of the twenty-three habeas
claims in applicant's original habeas corpus application had been raised and rejected on
direct appeal. (2) There would normally be no habeas review for any of these issues. On
November 17, 2004, we adopted the trial court's finding and conclusions on claims three
through twenty-three and denied relief. However, applicant's first two habeas claims deal
with whether his trial attorneys provided effective assistance of counsel. The first claim is
that one of those attorneys slept through large portions of the trial. After these ineffective
assistance of counsel claims were rejected on direct appeal, the Fifth Circuit held, in Burdine
v. Johnson, (3) that when a lawyer sleeps through significant portions of trial this conduct
results in the constructive denial of counsel. (4) Based upon Burdine, we filed this application
to reconsider our decision on direct appeal that applicant failed to show that he had been
"denied counsel" under the Sixth Amendment or that his attorneys provided constitutionally
"ineffective assistance of counsel." (5) After reviewing the evidence, the trial court's Findings
of Fact, and the applicable law, we now deny relief on those two habeas claims as well.

I.
 

A. The Evidence at Trial

 Shirley and Kenneth Kwan ran a grocery store in Houston. Mr. Kwan and the store's
security guard, James Powell, went to the bank twice a week for money to cash customers'
payroll checks. On November 15, 1991, the two men returned from the bank with a bank bag
containing $27,000 in cash. As they pulled up to the store, Mr. Powell noticed applicant
sitting nearby with a bag of leaves on his lap. As Mr. Kwan and Mr. Powell got out of the
car, applicant jumped up and shouted at Mr. Powell, who was carrying a shotgun: "Drop the
gun. Drop the gun. If you don't, I'll blow your Goddamned brains out." Mr. Powell
dropped the gun. Mr. Kwan ran to the front door of the store, but applicant fired two shots
at him. Mr. Kwan stood inside the doorway for a second and then dropped to the floor as
more shots were fired. Applicant's accomplice followed Mr. Kwan into the store. As
applicant yelled "Grab the bag," the accomplice, wearing a ski mask, stood over Mr. Kwan,
shot him in the back, and grabbed the bank bag. Mr. Kwan died from his wounds. He had
been shot a total of five times.

 Carolyn Bartie, a friend and customer of the Kwans, saw the entire robbery-murder
from her car in the store's parking lot. Ms. Bartie testified that she waved at Mr. Kwan, who
was getting out of his car, and she noticed applicant sitting nearby. She could see his face. 
He did not wear a disguise and never attempted to cover his face.

 Four days after the robbery-murder, applicant's nephew Craige Burks called Crime
Stoppers and said that three men were involved in the crime: applicant, Michael Clark, and
Albert Harris. Burks testified at trial that two weeks before the robbery, he was driving with
Michael Clark when Clark pointed to Mr. Kwan's grocery store and said that "he was going
to retire from armed robbery and that the Chinese guy [sic] supposed to bring him a bunch
of money." Burks also said that, on the day of the robbery, applicant came by his house in
a new car with a "bundle of money" and took him, his brother, and his uncle for a ride. 
Applicant told them he had dressed like a hobo, robbed and shot a Chinese guy, and pulled
a pistol on the security guard. He claimed that he and his two accomplices stole $50,000. 

 Houston Police Officer Bill Stephens investigated the robbery-murder of Mr. Kwan. 
Acting on Burks's tip, Officer Stephens showed Mr. Powell and Ms. Bartie a photo line-up. 
Mr. Powell made a tentative identification of applicant, and Ms. Bartie made a positive
identification of him.

 During the punishment phase, the State offered evidence of applicant's three prior
convictions, including an armed robbery, and evidence of three unadjudicated offenses.

 First, in September of 1991, applicant robbed two Wal-Mart employees in the store
parking lot as they returned from the bank with over $5,000 in cash. One of the victims
identified applicant as the man who put a machine gun to his head and demanded the money. 
Applicant and his accomplice drove off in the employee's truck, and, when one of the victims
followed them in another car, applicant got out of the truck and fired a shot at him.

 Second, just two days after the Wal-Mart robbery, applicant was arrested for an
altercation in a nightclub parking lot. Earlier in the evening he had gotten into a shouting
match with another nightclub patron. A security guard later saw the men still shouting in the
parking lot, then he saw applicant retrieve a handgun (later found to be loaded with hollow-point bullets) from his car and put the gun to the other man's back. The security guard ran
over and grabbed it. 

 Third, in December of 1991, police received information about a forthcoming "bank-bag robbery" on Lockwood. For over an hour they followed Michael Clark-one of
applicant's accomplices in the robbery-murder of Mr. Kwan-driving a red Jeep around town
when they saw applicant getting out of a stolen van which had been traveling with the Jeep.

 The defense put on three punishment phase witnesses. The custodian of records for
the Harris County Jail testified that applicant had not been involved in any disciplinary
incidents while in custody for this murder. Applicant's supervisor at a paper company
testified that applicant was a good worker during his five-year employment. Finally,
applicant's wife testified that she and applicant had two children and that he had always been
good to her. 

B. Applicant's Legal Representation

 Shortly after his arrest for capital murder, applicant hired his own trial counsel,
seventy-two-year-old John Benn. He retained Mr. Benn even though Mr. Benn had never
tried a capital murder case under current Texas law. Three months after Benn made his first
court appearance, the trial judge, in an abundance of caution, appointed Sanford Melamed
to serve as Mr. Benn's co-counsel. Mr. Melamed was a considerably younger attorney with
considerably more trial experience, albeit not in capital cases. (6) The judge warned Mr.
Melamed that he was to follow Mr. Benn's lead; he was not to make any decisions in the case
without first seeking the approval of both Mr. Benn and applicant. However, the trial judge
also warned Mr. Melamed that he should be prepared to try the entire case on his own.

 Applicant wanted nothing to do with Mr. Melamed and refused to sign the
appointment of counsel form. He wanted only Mr. Benn's assistance. (7) Richard Frankoff,
an attorney who had represented applicant on other criminal charges, sent applicant a letter
stating that he had known Mr. Melamed for years, that "[h]e is a very committed and
competent attorney," and that applicant should talk with Mr. Melamed.

 Mr. Benn, like applicant, also refused Mr. Melamed's assistance. Mr. Melamed
repeatedly tried to meet with applicant's retained counsel to discuss trial strategy and divide
up trial duties. Mr. Benn kept putting him off. As a result, the two lawyers had virtually no
pre-trial contact, and they never had a significant substantive conversation about the case. 
 Mr. Melamed testified that he knew that neither his client nor his co-counsel wanted
his involvement in this case. Mr. Melamed did not want to come between Mr. Benn and
applicant, but, as the trial neared, he realized he would be trying this case essentially by
himself. Mr. Benn testified at the writ evidentiary hearing that he had spent just four hours
preparing for applicant's capital murder trial. He also admitted that he did not file any pre-trial motions, interview or subpoena any witnesses, or visit the crime scene.

 Mr. Melamed, on the other hand, testified that he took numerous steps to prepare for
trial-studying a capital murder treatise, consulting with experienced capital-litigation
lawyers, observing portions of a capital trial, and filing numerous pre-trial motions. Mr.
Melamed said that, by the time the trial began, he was fully prepared to handle every aspect
of it. Had he needed more preparation time, he would have asked for a continuance. 

 Mr. Melamed said that the trial judge asked applicant at least twice before the trial
whether he wanted to continue with retained counsel Mr. Benn. Applicant said, "Yes," and
he never requested other or additional counsel. Applicant never expressed dissatisfaction
with Mr. Benn to either the judge or Mr. Melamed. 

 At trial, Mr. Melamed provided the lion's share of legal representation; Mr. Benn
sometimes slept during trial. At the hearing on the motion for new trial, he explained, "I'm
72 years old. I customarily take a short nap in the afternoon." Virtually everyone in the
courtroom noticed Mr. Benn sleeping. (8) Mr. Melamed stated that he first saw Mr. Benn
sleeping during parts of voir dire, and it got worse as the trial progressed. He said that the
bailiff would nudge Mr. Benn's chair during the trial to awaken him, and the judge
admonished Mr. Benn on numerous occasions. (9) 

 During its case-in-chief, the State put on fourteen witnesses, but Mr. Benn cross-examined only three. Although Mr. Benn said that he would prepare applicant's mitigation
case for the punishment phase, he did not, so again Mr. Melamed did. Mr. Benn did present
a closing argument to the jury. His remarks were extremely concise. He simply asked the
jury not to be swayed by an "eye for an eye" mentality, but rather to have sympathy for his
client and to spare his life. 

II.


 Applicant contends both that he was denied counsel under the Sixth Amendment and
that he received constitutionally ineffective assistance of counsel. Under Strickland v.
Washington, (10) a defendant claiming ineffective assistance of counsel must demonstrate that
(1) counsel's conduct "fell below an objective standard of reasonableness," and (2) this
incompetence caused the defendant prejudice. (11) Under Strickland, however, there are a few 
situations in which prejudice under the second prong will be presumed because these errors
are both "easy to identify" and "easy for the government to prevent." (12) In those situations,
it is "likely that case-by-case inquiry into prejudice is not worth the cost." (13) Such presumed-prejudice errors include the "actual or constructive denial" of counsel or "state interference"
with counsel's assistance. (14)


 Actual or Constructive Denial of Counsel Claim


 Applicant's first claim is that he was actually or constructively denied counsel 
because of his retained attorney's persistent habit of napping during the trial. He argues that
when Mr. Benn slept through significant portions of his trial, applicant was totally deprived
of that counsel's assistance. Applicant notes that in United States v. Cronic, (15) the Supreme
Court held that a defendant's Sixth Amendment rights are violated "if the accused is denied
counsel at a critical stage." (16) Under Cronic and its progeny, a defendant is denied counsel
not only when his attorney is physically absent from the proceeding, but when he is mentally
absent as well, i.e., counsel is asleep, unconscious, or otherwise actually non compos
mentis. (17) This prong of Cronic is epitomized by the "inert" (18) or "potted plant" lawyer who,
although physically and mentally present in the courtroom, fails to provide (or is prevented
from providing) any meaningful assistance. (19) In this situation, courts presume prejudice
based upon the actual or constructive denial of counsel "when such absence threatens the
overall fairness of a trial." (20)

 We agree that applicant did not have Mr. Benn's active assistance during his
postprandial naps and that those naps occurred during "critical stages" of his trial. However,
as this Court stated in the direct appeal of this case: 

 Appellant had two attorneys. Appellant was never without counsel. 
Additionally Melamed stated at the motion for new trial hearing that he was
prepared to do everything in the case. Although we do not condone Benn's
behavior, viewing the totality of circumstances, appellant fails to make any
showing that he was not effectively represented at trial by Melamed. (21)


 Had Mr. Benn been the sole attorney, applicant's Sixth Amendment right to counsel
might well have been denied under Cronic. But, Mr. Benn was not his sole attorney.

 Applicant now contends that, although he did have the constant, actual and active
participation of a second lawyer, "Melamed was an inexperienced lawyer who was paralyzed
by blind deference to an often unconscious lead counsel." He asserts that he is entitled to
relief under Cronic and its "presumed prejudice" standard because both of his attorneys
"entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." (22) 
Because, as discussed below, we conclude that Mr. Melamed provided constitutionally
effective representation, we necessarily reject the proposition that applicant had "no
meaningful assistance." 

 Under these circumstances, we cannot presume prejudice under Cronic. Applicant
has failed to demonstrate that the fundamental fairness of his trial was threatened by Mr.
Benn's conduct because his co-counsel was an awake, active, and zealous advocate in the
adversarial testing of the prosecution's case.

B. Ineffective Assistance of Counsel Claims

 In his second claim for relief, applicant alleges ineffective assistance of counsel under
Strickland because of his counsel's collective failure to: (1) properly investigate and prepare
for trial; (2) effectively cross-examine the State's witnesses; (3) call mitigation witnesses;
(4) advocate for the client during closing argument at the punishment phase; and (5) reveal
a conflict of interest. (23) 

 To prevail on these "ineffective assistance" claims, applicant must satisfy both prongs
of the Strickland test. First, he must prove that his counsel's conduct was objectively
deficient. (24) In assessing this, we look to see if counsel was acting as "a reasonably competent
attorney" would under the circumstances. (25) Applicant has the burden of proof and must
overcome a "strong presumption that counsel's performance fell within the wide range of
reasonable professional assistance." (26) This highly deferential review is employed to avoid
"the distorting effect of hindsight." (27) Thus, applicant must show that his attorneys made
"errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant
by the Sixth Amendment." (28)

 Second, even if a habeas applicant can demonstrate that his counsel's actions were
objectively deficient, he must still prove that their deficient performance prejudiced his
defense. (29) He must demonstrate that "there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been different." (30) The
Supreme Court has defined this "reasonable probability" as a "probability sufficient to
undermine confidence in the outcome." (31) In capital cases, the question is whether the
defendant would not have been found guilty of capital murder or whether "there is a
reasonable probability that, absent the errors, the sentencer ... would have concluded that the
balance of aggravating and mitigating circumstances did not warrant death." (32) Absent some
effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment
guarantee is generally not implicated. (33)

 We turn now to each of applicant's claimed ineffective assistance errors.


 
 Pre-trial Investigation and Preparation Claims
 


 Applicant claims that neither of his attorneys "perform[ed] any pre-trial investigation,
let alone reasonable investigation." He claims that Mr. Melamed's failure to interview the
prosecution witnesses was "manifestly unreasonable," and argues that the "State's case
against McFarland was thin at best." 

 At the writ hearing, Mr. Melamed testified to numerous pretrial preparations. For
example, he studied the leading treatise on capital murder defense. He also consulted with, 
observed, and discussed the facts of this case with three other defense attorneys who had
experience in capital murder trials. In addition, he reviewed the State's files and submitted
eight pre-trial motions, including a discovery motion, a motion for investigator fees, a motion
to suppress the identification evidence, and numerous motions in limine. He hired an
investigator, visited applicant once in the Harris County Jail, and conferred with him on the
telephone and during trial. 

 Mr. Melamed explained that his investigator did not attempt to interview the State's
eyewitnesses because he "believed it would not have been a good expenditure of
investigator's fees," and he viewed prosecution witnesses as being generally unwilling to
"voluntarily cooperate" with defense counsel. This was a strategic decision, made after Mr.
Melamed consulted with more experienced counsel in Harris County. (34) Instead, he had his
investigator visit the crime scene, canvass nearby locations in an attempt to find other
eyewitnesses, photograph the crime scene, construct a scene diagram, and review the
ballistics report and offense reports with him. 

 Further, when applicant finally spoke with Mr. Melamed, he gave counsel a list of
potential witnesses, but Mr. Melamed was unable to locate them. Mr. Melamed also
suggested calling various witnesses, including Mr. Frankoff, Walter Burks, or some other
family member, to challenge the competency and credibility of Craige Burks-one of the
State's star witnesses-but applicant rejected all of these suggestions. (35) 

 The trial court found that Mr. Melamed had developed a two-pronged defense trial
strategy before trial began: (1) that the person who committed the murder "committed, at
most, felony murder rather than capital murder"; and (2) that the evidence was insufficient
to prove, beyond a reasonable doubt, that applicant was present and committed the offense. 
The trial court found, as did this Court on direct appeal, that counsel's pre-trial investigation
was constitutionally reasonable. (36) 

 Furthermore, applicant fails to demonstrate how the failure to conduct further pretrial
investigation prejudiced him. Applicant argues that if defense counsel had interviewed
Craige Burks or reviewed his grand-jury testimony more thoroughly, they would have
discovered "inconsistencies" between that testimony and his trial testimony. He also relies
upon an undated post-trial affidavit purportedly signed by Craige Burks contradicting much
of his trial testimony (and possibly establishing perjury on one of the two occasions), but
there is no showing or suggestion that Mr. Burks would have told anyone this version before
he testified at trial. Thus, applicant fails, under Strickland, to demonstrate prejudice in
counsel's alleged failure to conduct additional pretrial investigation. 

 Based upon our review of the record, we agree with the trial court's findings that Mr.
Melamed's trial preparation was objectively reasonable under the circumstances and
consistent with a coherent trial strategy.

 2. Cross-Examination Claims

 Applicant claims that his attorneys failed to adequately cross-examine the only two
witnesses who definitively tied him to the crime, Carolyn Bartie, an eyewitness to the killing,
and Craige Burks, who called Crime Stoppers to implicate his uncle. Applicant claims that
his lawyers should have attacked Ms. Bartie's credibility as an eyewitness. (37) However, Ms.
Bartie testified consistently at both the identification hearing and at trial that she saw
applicant holding the security guard and firing at Mr. Kwan. Moreover, she identified
applicant from a photo spread and a live lineup. 

 Cross-examination is inherently risky, and a decision not to cross-examine a witness
is often the result of wisdom acquired by experience in the combat of trial. (38) It is frequently
a sound trial strategy not to attack a sympathetic eyewitness without very strong
impeachment. (39) Otherwise, an attorney risks reinforcing the eyewitness' previous
identification of the defendant as the assailant. (40) 

 Furthermore, cross-examination is an art, not a science, and it cannot be adequately
judged in hindsight. For example, had counsel so vigorously cross-examined Ms. Bartie as
to raise serious doubts about applicant's identity as the robber-murderer, the State might well
have been allowed to offer evidence during the guilt stage about applicant's extraneous Wal-Mart "bank-bag" robbery two months before the capital offense. A defense strategy that
avoids the introduction of extraneous offenses under Rule 404(b) is not constitutionally
ineffective.

 Next, applicant contends that counsel should have questioned Craige Burks about
previous inconsistencies in his testimony to the grand jury. In particular, he claims that when
Burks testified before the grand jury he stated that applicant discussed the murder while they
were in a family member's house, yet at trial, he testified that they discussed the murder
while riding in a car. However, these two statements are not necessarily in conflict with one
another, and they can be easily reconciled. In any event, it is impeachment on a relatively
minor issue. (41)

 In sum, counsels' failure to cross-examine these witnesses on certain discrepancies
did not fall below an objective standard of reasonableness. Applicant's suggestion that cross-examination should have been conducted in a different way "does not rebut the presumption
that counsel's conduct fell within the wide range of reasonable professional assistance." (42) 
Moreover, applicant fails to show that there is a reasonable probability that the result of his
trial likely would have been different had his attorneys impeached the witnesses on these
particular matters.

 Based upon its reading of the trial record, the habeas court found that "during the
guilt-innocence phase of the applicant's trial, trial counsel vigorously cross-examined all of
the State's substantive witnesses ... [and] addressed any conflicts in witnesses' testimony."

Like the claims above, this issue was raised and rejected on direct appeal. (43) Applicant does
not present sufficient new evidence to persuade us that our original decision was wrong. 

 3. Mitigation Evidence Claims

 Applicant claims that his attorneys were ineffective for failing to present mitigation

witnesses at the punishment stage of his trial. Although the defense case at punishment
lasted only fifteen minutes, this fact alone does not automatically result in ineffective
assistance of counsel. Some of the responsibility for such a short mitigation case lies with
applicant. (44) Mr. Melamed attempted to obtain the names of possible punishment witnesses
from applicant. Applicant, however, rebuked Mr. Melamed's attempts to develop
punishment witnesses and specifically instructed him not to contact members of his family. (45)
 
He told Mr. Melamed that Mr. Benn would handle that portion of the trial.

 The trial court found that Mr. Melamed talked with applicant for several hours on
several occasions about potential punishment-phase evidence and discussed applicant's
personal life with him. Mr. Melamed determined that there were no Penry-type issues in
applicant's case. Based upon the evidence at the writ hearing, the trial court further found 

 that Melamed attempted to obtain names of possible punishment witnesses
from the applicant; that the applicant rebuked Melamed's attempt to develop
punishment witnesses and specifically instructed Melamed that counsel Benn
would take care of it; and, that counsel Benn stated that he would take care of
having the applicant's relatives present for the punishment phase.


 Despite his writ allegation that counsel should have called any number of witnesses,
including family members, applicant names only one potential mitigation witness: Richard
Frankoff. Mr. Frankoff is an attorney who had formerly represented Mr. McFarland and had
known him for over eight years. In his affidavit, Mr. Frankoff states that he would have
testified that he knew Mr. McFarland to be "friendly and agreeable" and not a "violent man." 
Although Mr. Frankoff's testimony on direct examination could have been beneficial to the
defense, his attorneys might well have made a wise strategic decision in not calling him. If
Mr. Frankoff had testified, the State would have been permitted to cross-examine him about
his past representation of applicant, and specifically, his representation on the "violent"
Walmart "bank-bag" robbery, which was essentially a mirror image of this case. The trial
court found that Mr. Melamed made a strategic decision not to call Mr. Frankoff during the
punishment phase. Moreover, applicant himself specifically requested that Mr. Frankoff not
be called to testify. Given the potential hazards involved, we cannot conclude that counsel's
decision not to call Mr. Frankoff constituted ineffective assistance. (46)

 Furthermore, this matter was raised and rejected on direct appeal. (47) Applicant has
failed to name any specific witnesses, other than Mr. Frankoff, whom his attorneys should
have contacted or called as mitigation witnesses. Likewise, he has failed to show that these
unnamed witnesses were available to testify or that their testimony would have benefitted
him. Therefore, he fails to show prejudice. (48) 

 4. Jury Argument Claim

 Next, applicant claims that Mr. Benn's closing remarks to the jury during the
punishment phase essentially conceded his guilt and bolstered the State's case. Mr. Benn
was the last person to speak to the jury on applicant's behalf. As part of his closing remarks,
he told the jury that: 

If we could exchange George's life for his [Mr. Kwan's], I would say alright, but killing one man is not going to bring back
the life of another man. Eye for an eye, a tooth for a tooth went
out of civilized religion a long time ago.

 

Applicant argues that the jury would interpret these comments as an admission of guilt. 
However, this argument was made at the punishment phase after the jury had already found
applicant guilty. Therefore, Mr. Benn's conduct was not objectively deficient: he merely
accepted what the jury had already decided. (49) Additionally, even if counsel's comments were
an admission of guilt, applicant has failed to prove that they prejudiced his case. Applicant
has not shown that, but for Mr. Benn's argument, the jury likely would have answered the
special issues differently. (50) He has failed to prove either prong of the Strickland test.

 5. Conflict of Interest Claim

 Finally, applicant claims that Mr. Benn had a conflict of interest. He contends that
Mr. Benn previously represented Michael Clark, who was, according to Craige Burks,
peripherally involved in this capital murder. 

 The trial court concluded that relief on this ground should be denied for various
reasons. First, applicant failed to show that his attorney is the same John Benn who
represented Michael Clark or that this person was the same Michael Clark who might have
had some involvement in this case. (51) Second, even if Mr. Benn had once represented Mr.
Clark, that representation occurred sixteen months before this capital murder was committed. 
Finally, and most importantly, Michael Clark did not testify in this case. Therefore, Mr.
Benn never had the opportunity to cross-examine him. Any potential conflict never became
an actual conflict of interest. (52) Nor does applicant claim that, but for Mr. Benn's earlier
representation of Clark, applicant would have called him as a witness. 

 Applicant has failed to show that his counsel was burdened by any actual conflict of
interest and that the conflict had an adverse effect on counsel's performance. (53)




IV. 

 The evidence in this case shows that the trial judge recognized that Mr.
Benn-although he was clearly the sole attorney applicant wanted-was elderly and unprepared
to try a capital murder case. The trial judge was caught between Scylla and Charybdis. On
the one hand, he could foresee that Mr. Benn might not provide reasonably competent
representation, and, under the Sixth Amendment, a criminal defendant is entitled to
competent representation. (54) On the other hand, a criminal defendant also has a Sixth
Amendment right to the privately retained counsel of his choice, (55) and a trial judge may not
unilaterally remove a defendant's retained attorney without extraordinarily good cause. (56) 
Thus, the trial judge in this case did his best to satisfy both of these constitutional
requirements: he appointed an experienced and competent co-counsel to assist Mr. Benn and
take over as necessary. 

 We conclude that, although one of his attorneys slept through portions of the trial,
applicant was not deprived of the assistance of counsel under the Sixth Amendment because
his second attorney was present and an active advocate at all times. Furthermore, applicant
has failed to establish that he received ineffective assistance of counsel which deprived him
of his Sixth Amendment right to a fair trial. We therefore deny relief.

Cochran, J.

Delivered: May 18, 2005

Publish
1. McFarland v. State, 928 S.W.2d 482 (Tex. Crim. App. 1996) (en banc).
2. See McFarland v. State, 928 S.W.2d 482 (Tex. Crim. App. 1996). One new claim
asserted that applicant's direct appeal attorney was constitutionally ineffective because his
attorney filed many extensions, was forced to show cause why the brief had not been timely filed,
and ultimately filed a poor brief. On appeal, counsel raised thirty-three points of error in the
initial brief. He then filed a supplemental brief raising thirty-five more points of error. This
Court thoroughly addressed all of those points of error in a lengthy published opinion. The trial
court concluded that appellate counsel's representation was sufficient to "protect his right to
reasonably effective counsel in the primary case." Further, applicant failed to show that, but for
appellate counsel's performance, he would likely have prevailed on appeal. Ex parte Owenby,
749 S.W.2d 880, 881 (Tex. Crim. App. 1988) (to prevail on ineffective assistance of appellate
counsel claim, defendant must "must be able to show that the outcome of his appeal would be
different" had counsel provided competent counsel).

 A second new claim was a Brady v. Maryland, 373 U.S. 83 (1963), allegation concerning
the purported suppression of the grand jury testimony of Walter Burks and the destruction of the
tape of Craige Burks's telephone call to Crime Stoppers. In its writ findings, the trial court
concluded that applicant failed to show that: Mr. Burks's grand jury testimony contained Brady
evidence; the State withheld the transcript of Mr. Burks's testimony; admission of the grand jury
testimony would have been favorable to applicant; the State "withheld" the Crime Stoppers tape
which was destroyed in accordance with Houston Police Department policy after six months; or
the tape contained any exculpatory evidence. We adopted these findings and denied relief on
those claims on November 17, 2004.
3. 262 F.3d 336 (5
th Cir. 2001).
4. Id. at 341, 349 (concluding that an "[u]nconscious counsel equates to no counsel at all"
for purposes of the Sixth Amendment right to counsel in a criminal case).
5. Applicant's specific claims are as follows:

 1) McFarland's Sixth Amendment right to the assistance of counsel has been
deprived.

 2) The representation of McFarland falls far below an objective standard of
reasonableness and prejudiced the outcome of his trial.
6. Sanford Melamed testified at the writ hearing that he had practiced criminal law for
fourteen years, had been retained or appointed in over two hundred misdemeanor cases and over
six hundred felony cases, and had tried approximately thirty felony jury trials.
7. Ironically, one of applicant's direct appeal claims was that the trial court violated his
"constitutional right to counsel of his choice" by foisting an appointed lawyer upon him to assist
his retained counsel. 928 S.W.2d at 508. This Court concluded that "[w]here a trial court
deems, as in the instant case, that retained counsel may need assistance, it is acceptable to sua
sponte appoint additional counsel, and [this] does not violate a defendant's right to counsel of
choice." Id. 
8. In an affidavit submitted in the habeas proceeding, one juror stated that Mr. Benn's
sleeping "was so blatant and disgusting that it was the subject of conversation within the jury
panel a couple of times." 
9. After one of these incidents, the trial judge again asked applicant if he wanted a different
lead counsel appointed. Again, applicant declined. The writ record does not indicate whether
applicant himself knew that his retained lawyer frequently napped during the trial. Although the
present facts might well raise an issue of waiver, the trial court made no findings on that issue. 
Thus, we will not address the question of whether a defendant who refuses to accept the offer of
different, appointed lead counsel, when he knows that his retained attorney does not remain
awake during trial, forfeits any Sixth Amendment claim based on that counsel's penchant for
napping.
10. 466 U.S. 668 (1984).
11. Strickland, 466 U.S. at 687-88.
12. Id. at 692.
13. Id.
14. Id.
15. 466 U.S. 648 (1984).
16. Id. at 659.
17. Id. at 659; see also Burdine v. Johnson, 262 F.3d 336, 345 (5th Cir. 2001) (en banc)
(distinguishing between the total lack of counsel and ineffective assistance of counsel; noting that
prejudice is presumed "when, during a critical stage of a trial, counsel is either (1) totally absent,
or (2) present but prevented from providing effective assistance"); Javor v. United States, 724
F.2d 831, 833-34 (9th Cir. 1984) (defendant's Sixth Amendment right to counsel was violated
because his attorney slept through a substantial portion of his trial).
18. Gochicoa v. Johnson, 238 F.3d 278, 284-85 (5th Cir. 2000) (stating that prejudice is
presumed under Cronic's constructive denial of counsel prong "only when the defendant
demonstrates that counsel was not merely incompetent but inert, distinguishing shoddy
representation from no representation at all").
19. See Bell v. Cone, 535 U.S. 685, 696-97 (2002) (noting that, under Cronic, an attorney's
failure to test the prosecution's case must be "complete"; only when defense counsel "'entirely
fails to subject the prosecution's case to adversarial testing'" does presumption of prejudice
apply) (quoting Cronic, 460 U.S. at 658); see also Florida v. Nixon, 543 U.S. ___, ___, 125 S.Ct.
551, 555 (2004); French v. Jones, 332 F.3d 430, 439 (6th Cir. 2003).
20. Burdine, 262 F.3d at 347.
21. 928 S.W.2d at 505. 
22. Cronic, 460 U.S. at 658.
23. Applicant included his "sleeping lawyer" claim as one of his enumerated "ineffective
assistance" claims, but because another competent attorney provided zealous representation
during those interludes, we need not address the issue of Mr. Benn's ineffective assistance.
24. Id. at 694; Ex parte Nailor, 149 S.W.3d 125 (Tex. Crim. App. 2004).
25. Strickland, 466 U.S. at 687.
26. Id. at 689.
27. Id.
28. Id. at 687. 
29. Id.
30. Id. at 694.
31. Id.
32. Id. at 695.
33. Cronic, 466 U.S. at 656.
34. See Burger v. Kemp, 483 U.S. 776, 785 (1987) (noting that "[t]he district judge, who
presumably is familiar with the legal talents and character of the lawyers who practice at the local
bar and who saw and heard the witness testify, is in a far better position than we are to evaluate a
charge of this kind, and the regional courts of appeals are in a far better position than we are to
conduct appellate review of these heavily fact-based rulings").
35. See (Frank) McFarland v. State, 845 S.W.2d 824, 848 (Tex. Crim. App. 1992) ("When
a defendant preempts his attorney's strategy by insisting that certain evidence be put on or kept
out, no claim of ineffective assistance can be sustained").
36. McFarland, 928 S.W.2d at 500-01.
37. Specifically, applicant points out that Ms. Bartie originally described the assailant as
being approximately 5'8" and 150 pounds, whereas applicant asserts that he is 6'2" and 200
pounds. Applicant also argues that counsel failed to confront Ms. Bartie with the fact that her
version of the event purportedly conflicted with the factual accounts offered by other witnesses at
the scene. But, even if that were true, the rules of evidence prevent an attorney from impeaching
one witness's testimony with the testimony of other witnesses. See, e.g., McKinney v. State, 491
S.W.2d 404, 408 (Tex. Crim. App. 1973) (allowing prosecutor to ask defendant on cross-examination if State's witnesses were "lying" for testifying inconsistently with defendant's
version was argumentative, but not reversible error); Mason v. State, 449 S.W.2d 47, 49 (Tex.
Crim. App. 1969); United States v. Henke, 222 F.3d 633, 643 (9th Cir. 2000) (forcing a witness to
comment on another witness's testimony is inappropriate); State v. Maluia, 2005 Haw. LEXIS
157 (March 24, 2005). Counsel cannot be condemned for failing to do something that he is not
permitted to do. 
38. Coble v. State, 501 S.W.2d 344, 346 (Tex. Crim. App. 1973).
39. See, e.g., Dannhaus v. State, 928 S.W.2d 81, 88 (Tex. App.-Houston [14th Dist.]1996,
pet. ref'd).
40. See id. (noting that "[i]f ineffective, cross-examination can serve to bolster the
credibility of the witness and underscore the very points that are sought to be impeached. Thus,
unless there is a good basis on which to cross-examine ... it can be more effective to refrain from
cross-examining a damaging witness to minimize the impact of his testimony).
41. Applicant also claims that counsel should have pointed out an internal inconsistency in
Craige Burks's testimony. At one point, Mr. Burks testified that applicant said that he shot the
complainant, but later he testified that applicant said that Albert Harris shot the complainant. 
During closing argument, the State pointed out that Mr. Burks testified that Harris, not applicant,
shot Mr. Kwan. Had the defense emphasized the point that Mr. Burks also testified that
applicant shot the complainant, this might well have harmed, not helped, the defense case.
42. Resendiz v. State, 112 S.W.3d 541, 548 (Tex. Crim. App. 2003)(citation omitted).
43. McFarland, 928 S.W.2d at 506.
44. See Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be
determined or substantially influenced by the defendant's own statements or actions. Counsel's
actions are based, quite properly, on informed strategic choices made by the defendant and on
information supplied by the defendant").
45. Applicant cannot claim that his counsel was constitutionally deficient for abiding by
applicant's specific, explicit directive to refrain from contacting or calling specific potential
witnesses. See (Frank) McFarland, 845 S.W.2d at 848; Duncan v. State, 717 S.W.2d 345, 348
(Tex. Crim. App.1986)(stating that when defendant preempts attorney's strategy by insisting that
a particular defense be followed, claim of ineffectiveness will not stand; holding that defense
counsel was not ineffective when he attempted to follow trial strategy "thrust upon him" by
defendant). 

46. See (Frank) McFarland, 845 S.W.2d at 848; see also Williams v. Cain, 125 F.3d 269,
276 (5th Cir. 1997) (judging counsel's performance through a "highly deferential" lens and with a
view to "the facts and resources available to counsel at the time of trial," in concluding that
counsel's strategic decisions were based on professionally informed and competent assessment of
the information available).
47. 845 S.W.2d at 501.
48. King v. State, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) ("Counsel's failure to call
witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such
witnesses were available and appellant would benefit from their testimony"); see also Sayre v.
Anderson, 238 F.3d 631, 635-36 (5th Cir. 2001).
49. See Butler v. State, 872 S.W.2d 227, 245-46 (Tex. Crim. App. 1994) (counsel in capital
murder trial was not ineffective for conceding defendant's guilt during closing argument at
punishment stage; noting that "[t]rial counsel conceded appellant's guilt as a basis for his
argument that, in the eyes of God, two wrongs would not be able to make a right"). 
50. Even if Mr. Benn's closing argument strategy fell below professional norms, it "cannot
form the basis of a constitutional ineffective assistance of counsel claim because there is no
evidence that [it] prejudiced [applicant] or 'permeated [his] entire trial with obvious unfairness." 
Martinez v. Dretke, 2005 U.S. App. LEXIS 4726 at *32 (5th Cir. March 23, 2005) (quoting
United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002)).
51. Michael Clark was never charged with any offense related to this transaction, although
he was involved with applicant in other matters.
52. See Routier v. State, 112 S.W.3d 554, 579-86 (Tex. Crim. App. 2003) (lengthy
discussion of potential and actual conflicts of interest in context of capital murder prosecution). 
Here, as in Routier, the record does not support applicant's claim that an actual conflict of
interest existed. At best, applicant's allegation shows the possibility of a conflict of interest. The
showing of a potential conflict of interest does not constitute an actual conflict of interest. 
Routier, 112 SW.3d at 585-86. 

 To prove ineffective assistance of counsel based on an actual conflict of interest, the
defendant must show (1) defense counsel was burdened by a conflict of interest; and (2) the
conflict had an adverse effect on specific instances of counsel's performance. Cuyler v. Sullivan,
446 U.S. 335, 348-50 (1980); Monreal v. State, 947 S.W.2d 559, 564 (Tex. Crim. App. 1997). 
An actual conflict of interest exists if counsel is required to make a choice between advancing his
client's interest in a fair trial or advancing other interests to the detriment of his client's interests. 
Monreal, 947 S.W.2d at 564. When an attorney is unable to cross-examine a government
witness or is hindered in such a cross-examination because of a privilege arising from counsel's
prior representation of the witness an actual conflict of interest exists. United States v. Martinez,
630 F.2d 361, 362 (5th Cir. 1980).
53. See Mickens v. Taylor, 535 U.S. 162, 171-74 (2000) (citing Cuyler v. Sullivan, 446 U.S.
at 348-50).
54. Strickland, 466 U.S. at 693.
55. Wheat v. United States, 486 U.S. 153, 158-59 (1988) (Sixth Amendment affords
criminal defendants the right of counsel and, absent a conflict of interest or similar ethical
problem necessitating disqualification, the right to privately retained counsel of their own
choosing); Ex parte Prejean, 625 S.W.2d 731, 733 (Tex. Crim. App. 1981) (mandamus relief
granted when trial judge in capital murder case disqualified retained counsel for a conflict of
interest that defendant had explicitly waived; stating that "freedom of choice in the selection of
counsel by the accused" is guaranteed by both the federal and state constitutions as well as by
Texas statute).
56. See Stearnes v. Clinton, 780 S.W.2d 216, 220 (Tex. Crim. App. 1989) (trial courts do
not have "inherent power" to disqualify defense counsel of choice).