**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 01-10142

_____


UNITED STATES OF AMERICA,

                              Plaintiff - Appellee,


VERSUS


LOUIS JONES,

                         Defendant - Appellant.

_____

Appeals from the United States District Court
for the Northern District of Texas

_____


March 27, 2002

Before WIENER, BENAVIDES, and PARKER, Circuit Judges

ROBERT M. PARKER, Circuit Judge

     Appellant Louis Jones seeks a Certificate of Appealability ("COA") on the bases of ineffective assistance of counsel (two particulars), racial discrimination stemming from an alleged systematic pattern in the prosecution of death penalty cases by the United States Attorney General's office, and alleged selective prosecution of death penalty cases based on the geographic location of the defendant at the time that the crime was committed.  We deny

1

his application on all issues.

## I.   BACKGROUND.

Jones, a retired servicemember, was convicted of kidnaping with death resulting to the victim, in violation of 18 U.S.C. § 1202(a)(2), punishable by death under the Federal Death Penalty Act ("FDPA") of 1994, 18 U.S.C. § 3591, *et seq.*   Jones directly appealed his conviction and death sentence to this court and to the United States Supreme Court, both of which affirmed his sentences. *See United States v. Jones*, 132 F.3d 232 (5th Cir. 1998), *aff'd Jones v United States*, 527 U.S. 373 (1999).   The details of the crime and subsequent history are contained in those cases; a brief summation is all that is necessary for this review.

> Petitioner Louis Jones, Jr., kidnaped Private Tracie Joy McBride at gunpoint from the Goodfellow Air Force Base in San Angelo, Texas.   He brought her to his house and sexually assaulted her.   Soon thereafter, petitioner drove Private McBride to a bridge just outside of San Angelo, where he repeatedly struck her in the head with a tire iron until she died.   Petitioner administered blows of such severe force that, when the victim's body was found, the medical examiners observed that large pieces of her skull had been driven into her cranial cavity or were missing.

*See* 527 U.S. at 376.   Having exhausted his direct appeal, Jones sought a COA on collateral attack under 28 U.S.C. § 2255 from the district court, which denied his request.   He now seeks such a COA from this court, on the issues as outlined.   We have jurisdiction under 28 U.S.C. § 2253.

## II.   STANDARD OF REVIEW.

2

To prevail on an application for a COA, a petitioner must make a "substantial showing of the denial of a constitutional right, a demonstration that . . . includes showing that reasonable jurists could debate whether. . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Moore v. Johnson*, 225 F.3d 495, 500 (5th Cir. 2000), quoting *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). "Because the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

### III. ANALYSIS.

#### A. Ineffective Assistance of Counsel.

Jones makes two claims under the heading of ineffective assistance of counsel ("IAC"). First, he asserts that his trial counsel's admission of Jones's responsibility for McBride's death during his opening statement at trial violated Jones's rights under the Fifth and Sixth Amendments. Second, Jones asserts that a jury charge encompassing the language of 18 U.S.C. § 3593(e), as requested by his trial counsel, violated his rights under the Sixth Amendment.

We review IAC claims under the standard announced in *Strickland v. Washington*, 466 U.S. 669 (1984). The petitioner must show (1) that counsel's representation was deficient, and (2)

3

actual prejudice resulted from the deficient performance. *Id*. at 687; *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999).

As to Jones's first IAC claim, the issue is whether his counsel's comments regarding Jones's responsibility for Private McBride's death during his opening statement was properly a matter of considered trial strategy. Counsel's opening statement included the following remarks:

"I want to say to you at the very outset that Louis Jones does not dispute that he is responsible for the death of Tracie McBride. You will hear no excuses about insanity or self-defense. You will hear no evidence of justification." The remainder of counsel's opening statement made it clear that the defense strategy was to admit those incontestable issues that the defense could not avoid[1] to the jury, force the government to prove each element of its case, and rely on the presentation of mitigating evidence.[2]

Jones argues that this statement amounts to an admission of guilt to his capital murder charge. He further contends that such an admission amounts to an abandonment of his case by his defense

---

[1] *E.g.*, that Jones confessed orally and in writing and that his ex-wife, Sandra Lane, had identified Jones as a possible suspect in the McBride kidnaping/murder after Jones had kidnaped Lane and sexually assaulted her as well.

[2] *E.g.*, that Jones was a 22-year Army combat veteran who had retired with distinction to be with his then-wife, Sandra Lane, during her active duty service, that he had suffered poverty and sexual abuse as a child, that he was a religious man, and that he had mentally suffered as the result of the dissolution of his marriage to Lane.

4

counsel and is constitutionally infirm.

Jones further asserts that such a statement by counsel in the guilt-innocence phase without his client's consent is ineffective assistance of counsel. He notes, however, that the district court found that he was fully apprised of his counsel's informed strategic decision and that he concurred in its use, without attempting to contradict that finding. The record supports such a finding. Regardless, Jones argues as though his consent had not been obtained and as though his counsel's statement amounted to an "admission of guilt" of the crime charged. The authorities Jones cites to support his position are factually distinguishable from his case and are unconvincing.

The Eleventh Circuit has held that where a capital defendant seeks a verdict of not guilty by his testimony as well as by his plea, counsel, though faced with strong evidence against his client, may not concede the issue of guilt merely to avoid a somewhat hypocritical presentation during the sentencing phase and thereby maintain his credibility before the jury. *See Francis v. Spraggins*, 720 F.2d 1190, 1194 (11th Cir. 1983) (after an opening statement, hearing the prosecution's strong evidence, and having his capital defendant client testify that he denied any knowledge of crimes charged or making exculpatory statements to the police, defense counsel said to the jury at final argument, "I think [the defendant] went in the house and I think he committed the crime of

5

murder. . .").  That circuit has also held that counsel is ineffective in a capital case when he fails to understand the reason for a bifurcated trial, attempts a wholly unsupported affirmative defense of insanity and then abandons it mid-trial, fails to argue that a lesser included manslaughter offense might be applicable, commits various other blunders during trial, and openly admits his client's guilt for malice murder during closing arguments in the guilt-innocence phase while pleading for mercy from the jury.  *See Young v. Zant*, 677 F.2d 792, 796-98 (11th Cir. 1982).

Jones's other authorities are similar.  *See, e.g., United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991) ("[a] lawyer who informs the jury [in his closing argument] that it is his view of the evidence that there is no reasonable doubt regarding the only factual issues that are in dispute has utterly failed to subject the prosecution's case to meaningful adversarial testing") (internal quotations and citations omitted).  *See also Wiley v. Sowders*, 647 F.2d 642, 649 (6th Cir. 1981) (defense counsel is ineffective when he "surrender[s] the sword" by admitting in his closing arguments that his clients were "guilty as charged by the Commonwealth's Attorney's office" and that the prosecutor "has proved to you beyond a reasonable doubt that these gentlemen are guilty of this crime," without his clients' consent).

None of these authorities reflect the facts in Jones's case.

6

Jones's defense counsel recognized the strength of the prosecution's evidence and decided not to attempt an affirmative defense. He elected to rely on making the prosecution prove each element of the offense and on his ability to negate that proof in one or more elements. He did not put Jones on the stand, where contrary testimony might have been elicited from him. He obtained Jones's informed and knowing consent to pursue this trial tactic. He informed the jury in his opening statement that he would require the prosecution to prove each and every element of the offense charged, that of capital murder. His statement that Jones "[did] not dispute that he [was] responsible for the death of Tracie McBride" and would not be presenting insanity, self-defense, or justification defenses does nothing to undercut that trial tactic. Furthermore, a statement of responsibility for a death is not an admission as to each of the elements of a capital murder charge. Where defense counsel has admitted his client's responsibility for something less than the crime charged, we have held such a decision to be a permissible trial tactic, depending on the circumstances. *Kitchens*, 190 F.3d at 704 (in a capital murder case, pleading guilty to murder and arguing in closing that the defendant had committed a "very brutal, a very savage murder, but [] not a capital murder. . ." was a valid strategic decision to bolster credibility with the jury).

"Informed strategic decisions of counsel are given a heavy

7

measure of deference and should not be second guessed." *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir.), *cert. denied*, 528 U.S. 1013 (1999). There is nothing in the record to suggest that Jones's counsel blundered through the trial, attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable alternative course, or surrendered his client. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983). There is no hint of unfairness; in this case, counsel's tactic may have been the best available and the record amply reflects that Jones consented to its use.

Regarding Jones's second IAC claim, the issue is tied into the statutory language of § 3593(e), which provides that

> the jury, or if there is no jury, the court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release *or some other lesser sentence*.

(Emphasis added). Jones argues that the inclusion of "some other lesser sentence" may have given the jury the impression that, if the death penalty were not imposed, that some less-than "life

8

imprisonment without possibility of release" sentence might be imposed, which could have influenced them to impose the death penalty.

*Strickland* requires that we examine whether counsel's assistance was reasonable considering all of the facts of the case as of the time of counsel's conduct. *See Strickland*, 466 U.S. at 688-90 ("[t]hus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct"). Under existing Supreme Court precedent, due process requires that where a jury is invested with the responsibility to impose a sentence, a defendant has a liberty interest in the jury's being informed of all sentences that the governing statute allows it to impose. *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). In that view, because § 3593(e) refers to the possibility of "a lesser sentence," even if the only *actual* available sentences are the death penalty and life imprisonment without possibility of release, it is difficult to infer that counsel's inclusion of or failure to object to that language in this case was ineffective assistance. In contrast, where the government places a capital murder defendant's future dangerousness at issue, as it did in Jones's case, and the only alternative to the death penalty is life imprisonment without the possibility of release, as it is under federal law, the jury must be so informed.

9

*Simmons v. South Carolina*, 512 U.S. 154, 163-64 (1994); *Miller v. Johnson*, 200 F.3d 274, 290 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000). Thus, Jones argues, the inclusion of the "lesser sentence" language might lead to a juror's inference that life imprisonment without parole may not be the sole alternative to the death penalty.

To the extent that this quandary could lead to error on counsel's part, Jones suffered no prejudice as a result of it. As we noted previously in his case, the inclusion of that language imposed no prejudice on Jones based on any danger that the jury would believe that a non-unanimous deadlock between death and life without release could result in a "lesser sentence." Because § 3593(e) requires unanimity in the imposition of *any* sentence, any deadlock would have resulted in impaneling a second jury. *See United States v. Jones*, 132 F.3d at 242-43, *aff'd Jones v. United States*, 527 U.S. at 390-91. Similarly, Jones's latest argument on this point is meritless. The district court's jury instruction specifically informed the jury,

> If you recommend the imposition of a death sentence, *the court is required to impose that sentence*. If you recommend a sentence of life without the possibility of release, *the court is required to impose that sentence*. If you recommend that some other lesser sentence be imposed, the court is required to impose a sentence that is authorized by the law. In deciding what recommendation to make, you are not to be concerned with the question of what sentence the defendant might receive in the event you determine not to recommend a death sentence or a sentence of life without the possibility of release. That is a matter for the court to decide in the

10

event you conclude that a sentence of death or life without the possibility of release should not be recommended.

(Emphasis added). The jury had the knowledge that they, and they alone, had the power to impose (1) the death sentence, (2) life without the possibility of release, or (3) some lesser sentence that the court would choose and impose and about which the jury should not be concerned. The only thing that the jury did not know was that if they imposed "some lesser sentence," the district court would have been bound to sentence Jones to life without release. That is immaterial and does not invoke the concern in *Simmons* that a jury, not knowing that the sole alternative to death is life without release, might choose the death penalty out of worry that the defendant may one day wind up back on the street again.

For these reasons, we deny Jones's application for a COA on the subject of ineffective assistance of counsel.

**B.  Racial Discrimination.**

Jones also claims that the death sentence in his case was applied, in part, because of a "systematic pattern of racial discrimination by the Attorney General of the United States," which violated his rights under the Fifth and Eighth Amendments.

To make a substantial showing of the denial of a federal right in this instance, Jones must show that he was treated differently under the FDPA than others who were similarly situated. He has failed to do so.

11

In his request for a COA in the district court, Jones asserted that he was the victim of general racial discrimination according to a showing of statistics breaking down federal death penalty sentences by race. The district court held that those statistics were insufficient to meet the threshold showing that he was singled out for prosecution under the FDPA but that others similarly situated were not, and that there was no evidence in the record to support a claim of selective prosecution on the part of the government.

Jones has changed his claim on appeal. He now narrows the field of his selective prosecution contention to assert that he is the victim of racial discrimination because, of the six individuals on federal death row as of July 20, 2000, for having committed homicides involving interracial victims, five were black and one was white. He otherwise relies on the same statistical background provided by the federal government. *See* DEP'T OF JUSTICE, THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY (1988 – 2000), at 6-37 (2000)("the DOJ Report"). Among other portions of the report, Jones specifically cites Part IV, relating the determinations of Janet Reno, the United States Attorney General during all pertinent periods, and Part V, relating activities after authorization had been granted to pursue the death penalty in the various federal cases. On Jones's unopposed motion, the district court judicially noticed that report in its entirety.

12

Having only argued the broader statistical issue in the district court, Jones does not have grounds upon which to present a new argument on appeal. To the extent that his current argument is somehow buried within his original position, however, we make the following observations.

For the timeframe Jones cites, 1995 - 2000, the Attorney General authorized 159 total death penalty prosecutions. To reach this end, the Attorney General had submitted 682 potential death penalty cases for review by the combined United States Attorneys. The U.S. Attorneys recommended 183 total prosecutions, which included 48 white, 81 black, 39 Hispanic, and 15 "other" defendants. Those recommendations were made by U.S. Attorneys from 49 of the 94 federal districts. Of the 682 cases submitted to the U.S. Attorneys, 618 had been screened and remained active as of July 20, 2000. The Attorney General's independent Review Committee reviewed each of those 618 cases during the timeframe of the DOJ Report. The Review Committee also recommended 183 death penalty prosecutions, including 47 white, 80 black, 43 Hispanic, and 13 "other" defendants. The Attorney General then reviewed the 588 cases that had completed both reviews within the same report timeframe. She selected the 159 cases to prosecute, including 44 white, 71 black, 32 Hispanic, and 12 "other" defendants.

We agree with the district court that these statistics are insufficient to meet the threshold requirement that Jones was singled out for prosecution under the FDPA but that others

13

similarly situated were not. "The requirements for a selective-prosecution claim draw on ordinary equal protection standards. The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (internal quotations and citations omitted). By simply referring to raw statistics, which themselves demonstrate that defendants of white, black, Hispanic, and "other" ethnicity were prosecuted, Jones did not make a substantial showing of the possibility of a denial of a federal right on his broader statistical argument. Despite the narrower assertion he now offers us, he has done no more than repeat his error.

Jones argues that, instead of the racial discrimination standard employed in *Armstrong*, we should look to civil rights cases such as *Whitus v. Georgia*, 385 U.S. 545 (1967), in which the U.S. Supreme Court determined that the then-employed method of using tax records, in part, to populate juries disproportionately excluded blacks and that the defendants had made a sufficient *prima facie* case by showing the statistical imbalance between the juries and the population demographics. We reject that approach. The Court in that case also had the benefit of having seen the

14

defendants and having addressed the issue of jury composition in their case twice before. *Id.* at 546-47. Also, rather than screening the pool of potential jurors for the performance of a civic duty through mass data bases, such as voter registration or other means, criminal defendants are closely and individually scrutinized on a variety of bases. "The decision to prosecute one person and not another is a proper exercise of executive discretion with which [courts] are reticent to interfere." *United States v. Webster*, 162 F.3d 308, 333 (5th Cir. 1999). As we noted there, the proper inquiry is the two-prong approach of *Armstrong* whereby a petitioner's *prima facie* case must first show that he has been singled out for prosecution but others similarly situated of a different race were not prosecuted. Then, he must demonstrate that the discriminatory selection of him for prosecution is invidious or in bad faith, in that it rests on such impermissible considerations as race, religion, or the desire to prevent his exercise of his constitutional rights. *Id.* at 333-34. While we noted that sufficiently "stark" statistics might open a *prima facie* case, mere statistical evidence of racial disparity is usually *per se* insufficient to support an inference of any "unacceptable risk" of racial discrimination in the administration of capital punishment. *Id.* at 334. The statistics quoted herein are less stark than those we held insufficient in *Webster*.

To briefly examine Jones's modified claim, of all of the cases

considered by the Attorney General, 159[3] involved interracial homicides, in which at least one of the victims was of a different ethnicity from the defendant. Of those 159 cases, 20 white, 87 black, 39 Hispanic, and 13 "other" defendants were involved. Out of these, the Attorney General selected 7 white, 30 black, 9 Hispanic, and 5 "other" defendants to prosecute for the death penalty for a total of 51. Thus the Attorney General selected approximately one-third from each ethnic group except Hispanic, from which she selected about one-fourth. These statistics were also as of July 20, 2000, and reported in the DOJ Report dated September 12, 2000.

Jones cites the DOJ Report for the statistic that of 19 federal defendants on death row as of July 20, 2000, only six had been involved in an interracial homicide. Of those six, five were black and one was white. On that basis, he ascribes former Attorney General Janet Reno, solely and personally, as having conducted the death penalty authorizations on a discriminatory basis, presumably against black defendants who killed victims with other than black ethnicity. The portion of the DOJ Report Jones relies on, however, relates statistics going back to 1988, before Ms. Reno was appointed. A snapshot statistic of conditions on a

---

[3] By coincidence, the number 159 appears both as the number of interracial homicides out of the 588 reviewed by the former Attorney General and as the total number of cases selected out of the 588 for death penalty prosecution. Those numbers do not reflect the same population. Of the 159 total death penalty prosecutions authorized, only 51 involved interracial homicides.

16

single day, without more, is unconvincing, and Jones's assertion that a single actor was responsible and acted with discriminatory intent is unsupported. Further, obviously, the group of 51 death penalty defendants who had been involved in interracial homicides documented in the DOJ Report included an ethnic mix of whites, blacks, Hispanics, and "others" regardless of the racial mix of the six with whom Jones takes issue as of one day in time.

These statistics cannot of themselves meet the threshold requirement of establishing that Jones was singled out for prosecution under the FDPA, whether for an interracial homicide or otherwise, but that others similarly situated were not. *Id.*

We deny Jones's application for a COA on this issue.

## C. Geographic Selectivity.

Finally, Jones argues that his death sentence was due, in part, to an arbitrary factor of geography. Essentially, he asserts that, although federal law applies equally throughout the states, federal death penalty cases originate only or primarily from those states, such as Texas, that also have a high propensity to pursue the death penalty under state law. According to Jones, such "geographic selectivity" of federal law violates his Fifth and Eighth Amendment rights.

His argument is meritless. Of the 19 cases on federal death row as of July 20, 2000, Jones asserts that 13 come from only three states - Texas, Virginia, and Missouri. Those states tend to be

high in the rankings of states that prosecute death penalty cases under their own state law.

The 19 cases Jones cites were not prosecuted under state law, however. They represent independent prosecutions in various federal judicial districts, managed under the Attorney General of the United States. Jones presumably asserts that, somehow, being located in a state that imposes the death penalty under state law influences an office of the U.S. Attorney.

The same DOJ Report cited by Jones reports that the 19 defendants were prosecuted in 14 individual cases. Ten of those cases included single defendants and four included two or more. They were prosecuted in 12 judicial districts in 10 states. As we have already observed, for the period 1995 - 2000, U.S. Attorneys in 49 of 94 federal districts recommended death penalty prosecutions. That is much broader than the districts limited to the states that Jones has singled out. Jones has presented nothing to show that any of those states, and Texas in particular, have had any influence on their resident U.S. Attorney's offices as to whether to prosecute the death penalty or to refrain from such prosecution.

We deny Jones's application for a COA on this issue.

## IV. CONCLUSION.

For the reasons stated above, Jones has not made a substantial showing of the denial of a federal right and we therefore deny his

18

application for a certificate of appealability on these four issues.