# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 31, 2014

No. 12-50469

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

MACE MCGREW, also known as Mace Lee McGrew,

Defendant – Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:07-CV-259

Before DENNIS, CLEMENT, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Mace McGrew appeals the district court's denial of his 28 U.S.C. § 2255 motion, in which he attacked his conviction and sentence for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  We AFFIRM.

## FACTS AND PROCEEDINGS

McGrew was present at his girlfriend Renee Chapman's house when two probation officers and two sheriff's deputies arrived to conduct a probation compliance check on Chapman.  On their arrival, Chapman consented to a

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-50469

search of the house, at which McGrew spent several nights each week. During their search of the bedroom Chapman shared with McGrew, the probation officers found an AK-47-style rifle in a blue sheath concealed under their bed, as well as a loaded ammunition magazine, a locked lockbox, and a bulletproof vest. Elsewhere in the bedroom, the officers found a box of .40 caliber handgun ammunition, an empty shoulder holster, a night vision device, and a shoebox containing marijuana. Chapman denied that the rifle was hers and told the officers that another man, later identified as William Tutt, had brought some "stuff" over to the house.

McGrew was sitting on a couch in the living room while the officers conducted this search. As the officers brought the discovered items into the living room, McGrew admitted that the marijuana was his but denied ownership of the rifle. Considering the possibility that there was a handgun elsewhere in the house because of the discovery of the empty holster and box of handgun ammunition, the officers continued to search the house and attempted to open the lockbox discovered in the bedroom. Chapman and McGrew both told the officers that the lockbox was not theirs, that they did not have a key, and that it belonged to Tutt. McGrew then called Tutt and asked him to bring the key, Tutt arrived with the key, the officers opened the lockbox, and in it they discovered money and another ammunition magazine. The officers allowed Tutt to leave the house with the money but arrested McGrew for possession of the marijuana and the rifle.

McGrew and Tutt were both indicted for possessing the rifle as felons, in violation of 18 U.S.C. § 922(g)(1), and tried. Because McGrew was being prosecuted under a constructive possession theory, the key issue at trial was

No. 12-50469

whether McGrew had known about the rifle being under the bed.  McGrew's primary defense was that, while he had allowed Tutt to store a number of items in the bedroom, he had not known what they were and had not known about the rifle.  To this end, Chapman testified that, on the night that Tutt had brought the items, including the rifle, to the house, McGrew had drunk approximately five beers while on prescription pain medication, and that by the time Tutt came over McGrew was semiconscious or unconscious.

The Government presented testimony  from all four officers.  One of the officers, Sheriff's Deputy Robert Gallegos, testified that McGrew, on being questioned after the search, initially denied that the rifle was his but eventually admitted that he had known that the rifle was under the bed.  Tutt took the stand in his own defense and inculpated McGrew, testifying that, trying to dispose of the rifle, he had contacted McGrew who had agreed to accept possession of it.

At the conclusion of trial, the jury found McGrew guilty and Tutt not guilty, and the district court sentenced McGrew to 51 months' imprisonment. McGrew appealed, asserting claims of evidentiary insufficiency, of a due process violation resulting from a discovery error on the part of the Government, and of a Sixth Amendment Confrontation Clause violation.  We affirmed the judgment of the district court. *United States v. McGrew*, 165 F. App'x 308 (5th Cir. 2006).

Over a year later, McGrew filed a 28 U.S.C. § 2255 motion for post-conviction relief, alleging ineffective assistance of appellate counsel and a Fifth Amendment claim.  The Fifth Amendment claim was based on the officers' having questioned McGrew about the rifle without first informing him of his *Miranda* rights.  The district court denied this motion without holding an

evidentiary hearing, but we granted a certificate of appealability and reversed the district court in part, remanding for an evidentiary hearing into the Fifth Amendment claim. *United States v. McGrew*, 397 F. App'x 87, 95 (5th Cir. 2010).

At the evidentiary hearing, Deputy Gallegos admitted that McGrew was not free to leave after he admitted to possession of the marijuana. Gallegos also admitted that he questioned McGrew about the rifle hoping that McGrew would incriminate himself. Gallegos further conceded that he had not given McGrew *Miranda* warnings prior to questioning him. McGrew argued, and the district court held, that the admission of Gallegos's testimony regarding McGrew's statements that he knew about the rifle violated McGrew's Fifth Amendment rights. However, because McGrew did not raise this issue prior to his § 2255 motion, the district court held it to be procedurally defaulted.

McGrew contended that he could establish cause to overcome the procedural default because his trial counsel, Edward Bravenec, had provided ineffective assistance by not bringing a motion to suppress Gallegos's testimony about McGrew's statements. McGrew asserted that Bravenec had access to Gallegos's police report prior to trial and that it indicated that Gallegos would testify that McGrew had said that he knew about the rifle. At the evidentiary hearing, Bravenec testified that he had believed, having read a number of the police reports including Gallegos's and having spoken to McGrew, that Gallegos's testimony would be that McGrew had known there were items under the bed but had not known that they included a rifle. Bravenec thought this testimony would be favorable to the defense and therefore did not move to suppress.

In light of Bravenec's explanation, the district court held that Bravenec's failure to suppress Gallegos's testimony about McGrew's statements was "sound

trial strategy" and did not amount to ineffective assistance. Therefore, McGrew had failed to demonstrate cause to excuse the procedural default of his Fifth Amendment claim. The district court granted McGrew a certificate of appealability on this issue, though, and McGrew now appeals.

## STANDARD OF REVIEW

In considering a district court's denial of a § 2255 motion, we review factual findings for clear error and conclusions of law *de novo. United States v. Underwood*, 597 F.3d 661, 665 (5th Cir. 2010). "A movant is barred from raising jurisdictional and constitutional claims for the first time on collateral review unless he demonstrates cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error." *United States v. Patten*, 40 F.3d 774, 776 (5th Cir. 1994) (per curiam). "Ineffective assistance of counsel . . . is cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate ineffective assistance of counsel, a defendant must show (1) that his "counsel's representation fell below an objective standard of reasonableness," and (2) that this ineffectiveness was "prejudicial to the defense." *Strickland v. Washington*, 466 U.S. 668, 688-92 (1984). "There is a strong presumption in favor of competency." *Martinez v. Dretke*, 404 F.3d 878, 885 (5th Cir. 2005). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Id.* (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)).

## DISCUSSION

McGrew advances two arguments for why Bravenec was constitutionally ineffective. First, he argues that the record indicates that Bravenec failed to

recognize at the time of trial that a motion to suppress was warranted or would have been successful.  Second, he asserts that, because of Gallegos's police report, Bravenec knew or should have known that Gallegos would testify that McGrew had stated that he knew about the rifle, and that Bravenec's failure to move to suppress in light of that knowledge was not a sound trial strategy or otherwise effective assistance.

### 1. *Failure to recognize suppressibility*

McGrew points to the transcript of a hearing before the district court after trial but before sentencing in which he successfully moved to have Bravenec dismissed as his counsel.  McGrew claims that Bravenec's testimony at this hearing show that he was unaware that a motion to suppress McGrew's statements was even a possibility.  Specifically, McGrew points to Bravenec's explanation that: "The motion to suppress, the reason I did not file it is because in my view, after reviewing the facts, that it would be in fact a frivolous motion. They had a clear right to search, they had a warrant to search the residence." McGrew contends that this comment allows the inference that Bravenec was unaware that there was a possibility of suppressing any testimony about McGrew's statements, as Bravenec focuses solely on the possibility of suppressing items recovered in the officers' search.

However, McGrew's characterization of this testimony does not fairly reflect the full context of the hearing.  At the hearing, Bravenec was responding specifically to a complaint raised by McGrew that he had failed to file a motion to suppress the evidence discovered in the search of the house.  In explaining his disagreements with Bravenec, McGrew had stated that "I would have prevented any evidence from being used that was gained illegally," repeatedly argued that

his arrest was without probable cause, invalidating any search incident to his arrest, and later clarified that "[a]s far as them searching Ms. Chapman's home, I don't understand how she can sign a consent to search her home and then contraband found by her probation office and I get arrested for it."

Because Bravenec's statement that a motion to suppress the physical evidence seized in the search would not have been warranted was in response to McGrew's argument on that issue, it is not reasonable to infer from it that Bravenec was unaware of an entirely different evidentiary issue, especially in light of Bravenec's later testimony at the § 2255 evidentiary hearing, which indicates that he was in fact cognizant of the possibility of filing a motion to suppress McGrew's statements.

*2. Sound trial strategy*

McGrew's second argument is that Bravenec's failure to move to suppress any testimony about McGrew's statements constituted ineffective assistance, as Bravenec knew or should have known that Gallegos would testify that McGrew said that he knew about the rifle. McGrew bases this argument on Gallegos's police report, which was turned over to Bravenec during discovery. McGrew contends that this report unequivocally established that Gallegos would testify to the effect that McGrew had told him that he knew about the rifle under the bed.

The relevant portion of Gallegos's report reads:

[I] took all the evidence into the living room and as [McGrew] saw what I had he stated that the marijuana was his. As for the weapon, he stated that a male he slightly knew [Tutt] had brought over a small safe and the weapon inside a blue sleeve. He stated that he had given permission to [Tutt] to place the property under

the bed. [McGrew] stated that he had not asked [Tutt] what he had but gave his permission to bring it over and leave it at his residence.

At the § 2255 evidentiary hearing, Bravenec was confronted with Gallegos's report and explained his decision not to file a motion to suppress at some length. Bravenec testified that he was unwilling to put McGrew on the stand because of his criminal history and pending state criminal charges against him. His theory of the case was that McGrew had known that Tutt had placed items under the bed, but that McGrew had not known what those items were. Bravenec wanted to make this argument to the jury and believed that the officers, including Gallegos, would make it for him if they were allowed to testify about what McGrew had told them.

> Specifically, at the evidentiary hearing Bravenec testified that:
>
> Mr. McGrew told me . . . that he had told the police that . . . [Tutt] had come over and put something underneath his bed. . . . [A]nd our whole story [was] that Mr. McGrew didn't know what . . . was placed underneath his bed[,] that he didn't know it was a rifle. And because of Mr. McGrew's background, I thought it was impossible to put him on the witness stand.
> . . .
> Mr. McGrew told me and [one of the other police reports] indicated that [the officers] would say that Mr. McGrew said that [Tutt] put "something" under his bed or some things under his bed. Nowhere did I see the statement that Mr. McGrew said, oh, yes, he put that gun underneath my bed.

As a result, Bravenec testified that his expectation that the officers' testimony about McGrew's statements would be favorable in the context of his defense theory, so he made no motion to suppress.

Bravenec's view of what the officers, including Gallegos, were likely to say is not squarely contradicted by Gallegos's report. The report says that McGrew

told Gallegos that Tutt "had brought over a small safe and the weapon inside a blue sleeve," but this reference to "the weapon" does not necessarily indicate prior knowledge of the rifle as, at the point that McGrew was speaking to Gallegos, the rifle had already been discovered by the officers and was visible to McGrew as he spoke. The ambiguous reference to "the property" in the next sentence of the report, coupled with McGrew's insistence that he had not asked Tutt what he would be bringing over, also cast doubt on whether McGrew knew there was a weapon underneath his bed before the rifle was produced by the officers.

Furthermore, while Gallegos did testify on direct examination at trial that McGrew had admitted that "[h]e knew it was there . . . but . . . said it wasn't his," on cross-examination Bravenec was able to get Gallegos to make admissions about McGrew's statements that favored the defense. Gallegos admitted that McGrew had actually said words to the effect of "oh, that must have been what Mr. Tutt brought over but I didn't know what that was." Gallegos also clarified definitively on cross-examination that the officers had not questioned McGrew about the rifle before showing it to him and conceded that "[o]nly after he had seen the gun did he say, oh, that must be Mr. Tutt's."

Bravenec's strategy of relying on the officers to testify in support of his theory of the case may have been risky, but our review of an attorney's performance under *Strickland* is "highly deferential." *Strickland*, 466 U.S. at 689. "Given the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices." *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993). Bravenec faced a very difficult challenge in convincing a jury that his client did not know

No. 12-50469

about a sizable weapon found underneath the bed he admitted to having slept in the night before.  Compounding this quandary was a co-defendant who, in his own testimony and through other witnesses, aggressively sought to inculpate McGrew.  Based on Bravenec's explanation at the § 2255 hearing, his decision to allow testimony about McGrew's statements to the officers in the not-unreasoned—and not entirely unrealized—hope that it would end up helping McGrew's case was not "so ill chosen that it permeate[d] the entire trial with obvious unfairness." *Dretke*, 404 F.3d at 885 (quoting *Jones*, 287 F.3d at 331). As a result, the decision not to file a motion to suppress did not constitute ineffective assistance under *Strickland*, and it cannot amount to cause to excuse McGrew's procedural default of his Fifth Amendment claim.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

No. 12-50469

JAMES L. DENNIS, Circuit Judge, dissenting:

The majority concludes that appellant-defendant Mace McGrew received constitutionally sufficient assistance of counsel when his criminal defense attorney declined to seek to suppress an inculpatory statement procured in violation of the Fifth Amendment. McGrew's trial counsel, Edward Bravenec, failed to investigate the factual or legal basis for suppression, and instead blindly relied upon an illogical assumption that a police officer testifying for the prosecution's case-in-chief would testify in accordance with the theory of defense. The police officer's testimony regarding McGrew's unconstitutionally elicited statement established an essential element of the offense of conviction, being a felon in possession of a firearm under 18 U.S.C § 922(g)(1). After a jury trial, McGrew was convicted and sentenced to fifty-one months of imprisonment.

The majority credits Bravenec's assertion that the decision to decline to seek suppression of McGrew's statement was strategic and thus does not amount to ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668 (1984). Because I disagree with the majority's contention that a defendant's Sixth Amendment right is adequately protected when counsel fails to move to suppress incriminating testimony against his client without prior legal and factual investigation into the likelihood of success of the motion and its potential benefits to his client's defense, I respectfully dissent.

**I.**

The crux of McGrew's argument on appeal is that his self-incriminating statement to the police during a custodial interrogation should have been suppressed because the officers did not read him his *Miranda* warnings. *See Miranda v. Arizona,* 384 U.S. 436 (1966). As noted by the majority, because he

11

did not raise this issue on direct appeal, he is procedurally barred from bringing it in this collateral habeas petition unless he shows cause for the procedural default and actual prejudice resulting from the error. *United States v. Frady*, 456 U.S. 152, 167-68 (1982); *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992). A petitioner may satisfy the cause-and-actual-prejudice standard by showing that trial counsel rendered unconstitutionally ineffective assistance of counsel. *Pierce*, 959 F.2d at 1301; *see also United States v. Patten*, 40 F.3d 774, 776 (5th Cir. 1994). In other words, in order to overcome the procedural default, McGrew must demonstrate cause and prejudice by showing that his trial counsel was ineffective. In my view, McGrew has sufficiently established that trial counsel's performance violated his Sixth Amendment right to effective assistance of counsel, has overcome the procedural default, and is thus entitled to relief.

## II.

McGrew was at the home of his girlfriend, Renee Chapman, who was on probation at the time, when two probation officers and two sheriffs, including Officer Gallegos, went to the home to check on Chapman. Chapman's probation officer initiated the check after being falsely notified that narcotics were being manufactured in and sold from the premises. Chapman consented to the search of the home. Neither McGrew nor Chapman were allowed to leave the house once the search began. McGrew remained in the living room, surrounded by multiple officers, throughout the entirety of the approximately two-and-a-half hour occurrence.

During the search of Chapman's home, the probation officers found an AK-47 assault rifle in a blue sleeve, a safe, and a bullet-proof vest, under the bed in the master bedroom that McGrew and Chapman shared. Officers also found

No. 12-50469

ammunition, an empty pistol holder, and some marijuana. When the officers brought these items into the living room, McGrew voluntarily admitted that the marijuana was his but initially stated that the rifle was not. As for the safe, McGrew and Chapman told the officers that it belonged to their friend, William Tutt. Tutt was called and thereafter came over to Chapman's house with the key and opened the safe for the officers. Inside the safe was cash, a rifle magazine, ammunition, and some plastic bags.

Without reading McGrew his *Miranda* rights, and while McGrew was not free to leave the premises, Gallegos questioned McGrew for the purpose of procuring an incriminating statement regarding the firearm—that is, a confession from McGrew that he knowingly possessed the firearm.[1] This custodial interrogation lasted approximately one hour. Later, during McGrew's trial for being a felon in possession of a firearm, Gallegos testified that during the interrogation, McGrew denied ownership of the gun, denied knowledge of the contents of the safe, but admitted to Gallegos that he knew the firearm was under his bed. The prosecution's theory of the case was that McGrew constructively possessed the firearm because he knew it was stored under his

---

[1] An officer is required to administer *Miranda* warnings when a person is in custody and subject to interrogation. Whether a person is in custody is determined by an objective analysis of whether, under the circumstances, a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "Volunteered statements of any kind are not barred by the Fifth Amendment . . . . [T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Because McGrew was surrounded by multiple officers, was not permitted to leave, and was asked questions by Officer Gallegos for the purpose of eliciting incriminating statements regarding the firearm, he was subject to a custodial interrogation and should have been provided *Miranda* warnings before Gallegos began questioning him.

No. 12-50469

bed. Gallegos's testimony thus established an essential element of being a felon in possession of a firearm.

Bravenec, McGrew's defense attorney, did not move to suppress McGrew's statement to the police regarding the firearm under his bed, despite Bravenec's possession of Gallegos's police report indicating that McGrew made incriminating statements to the officers with regard to the firearm. Bravenec knew or should have known that McGrew had been interrogated without having been given his *Miranda* rights warnings and he does not contend otherwise. Nonetheless, Bravenec made no attempt at any stage of the proceedings to exclude the statement—he failed to file a pretrial motion to suppress and likewise did not move to strike Gallegos's testimony regarding the statement after it was elicited on direct examination.

## III.

The Supreme Court in *Strickland* announced a high, but not insurmountable, standard for establishing an ineffective-assistance-of-counsel claim. There is a two-step process for assessing such a claim:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. To establish deficiency, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.*

14

No. 12-50469

at 688. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). "[C]ounsel's failure to move to suppress evidence, when the evidence would have been suppressed if objected to, can constitute deficient performance." *Ward v. Dretke*, 420 F.3d 479, 488 (5th Cir. 2005) (internal quotation marks omitted). In assessing whether counsel's performance with respect to his decision not to file a motion to suppress was objectively reasonable, the court must first determine if the decision "could be construed as 'sound trial strategy,'" and, if it concludes "that the decision was strategic, conscious, and informed, then [the court] should ask whether it rendered the proceedings obviously unfair." *United States v. Cavitt*, 550 F.3d 430, 440 (5th Cir. 2008). If the court concludes that the decision was not a "sound trial strategy," but rather falls below an objectively reasonable standard of representation, then the court moves to the second prong of the *Strickland* analysis to determine whether the defendant was prejudiced by counsel's deficient performance. *See Strickland,* 466 U.S. at 687; *Day v. Quarterman,* 566 F.3d 527, 536 (5th Cir. 2009).

## A.

Without investigation or research, Bravenec's decision to abstain from attempting to suppress McGrew's custodial statement—a statement that established an essential element of the charge and was made in violation of *Miranda*—was not "sound" trial strategy or within the objective standard of reasonableness and thus amounts to deficient representation under *Strickland*.

*See, e.g., Kimmelman v. Morrison*, 477 U.S. 365, 387 (1986) (concluding that counsel's decision to decline to seek suppression after failing to request discovery—and thus without any knowledge of the State's case—constituted deficient performance).

Despite his protestations to the contrary, Bravenec's failure to seek suppression of McGrew's inculpatory statement was not a tactical, sound trial decision.   During the evidentiary hearing regarding McGrew's ineffective-assistance-of-counsel claim, Bravenec insisted that his decision was part of his trial strategy, asserting that he believed that Officer Gallegos's testimony would be that McGrew was unaware that a rifle was under his bed, yet knew that Tutt had placed some unknown property there.   Bravenec's defense theory was that McGrew lacked knowledge of what exactly Tutt stored under the bed, had no actual knowledge of the rifle, and therefore did not have constructive possession of the weapon.   Bravenec's only basis for believing that Gallegos would testify in accord with this theory was Gallegos's report—which was essentially a single paragraph with just two sentences dedicated to an hour-long custodial interrogation.   Bravenec had no other written record or transcript of what was said during that hour, nor any indication of how Gallegos may have interpreted McGrew's statements.   Thus, Bravanec had no reliable indication of what transpired during the interrogation and no reasonable or informed basis to conclude that suppression was not warranted.   Moreover, Bravanec's trial file revealed that he did not interview any of the officers involved, nor did his file contain any evidence of research into Fifth Amendment law, and further, it lacked any indication that he discussed the issue of suppression with McGrew. The record therefore suggests that, rather than conduct an investigation,

16

No. 12-50469

Bravenec *guessed* that Gallegos would testify for the prosecution in a way that did not help the prosecution, but helped the defense.

**1.**

To reach the assumption that Bravenec reached—that Gallegos's testimony regarding McGrew's statement would be favorable—one has to choose between the least likely of two possible interpretations of Officer Gallegos's report. Gallegos's report states, in pertinent part:

> [I] took all the evidence into the living room and as [McGrew] saw what I had he stated that the marijuana was his. As for the weapon, he stated that a male he slightly knew [Tutt] had brought over a small safe and the weapon inside a blue sleeve. He stated that he had given permission to [Tutt] to place the property under the bed. [McGrew] stated that he had not asked [Tutt] what he had but gave him permission to bring it over and leave it at the residence.

During the evidentiary hearing, Bravenec admitted that there are two possible readings of this passage. One, that McGrew admitted he gave Tutt permission to keep the safe and weapon under his bed and thus inevitably knew and consented to storing the firearm in the house. In this interpretation, the words "the property," refer back to the "safe and the weapon inside the blue sleeve"—i.e., "He stated that he had given permission to [Tutt] to place the [safe and the weapon inside a blue sleeve] under the bed." Under this interpretation, McGrew's statement is highly inculpatory in that it establishes his knowledge and constructive possession of the weapon. And, of course, this inculpatory interpretation was the one presented at trial. A second interpretation is that McGrew gave Tutt permission to store unspecified items under the bed and never knew what Tutt placed there until officers confronted him about it during

17

the search. Under this interpretation, one must assume that "the property" does not refer to the safe and the weapon, but instead indicates only that McGrew knew that something would be placed under the bed and thus McGrew did not have actual knowledge of the weapon—in other words, "He stated that he had given permission to [Tutt] to place [some unknown objects] under the bed."

Bravenec was unable to explain why he relied on the second, exculpatory interpretation. Bravenec's file and testimony reflect that he never spoke with or attempted to interview Gallegos to determine the substance of Gallegos's intended testimony regarding McGrew's custodial statements. Moreover, Gallegos was a Sheriff's Deputy testifying *for the prosecution*. The prosecution's theory of the case was that McGrew constructively possessed the firearm because he knew that it was stored under his bed. Thus, it is objectively unreasonable to conclude that Gallegos would testify for the prosecution's case-in-chief that, in fact, McGrew did *not* know the firearm was under his bed, particularly given the other, more likely interpretation of the report. Bravenec unreasonably used this scant, vague police report as the primary basis with which he decided to squander the opportunity to preclude McGrew's inculpatory statements that were obtained in violation of his Fifth Amendment right against self-incrimination and which could have been suppressed had Bravenec attempted to do so.[2]

---

[2] The record does not clearly establish whether Bravenec had actual knowledge that the statements were taken in violation of McGrew's Fifth Amendment rights. However, if Bravenec had interviewed the officers involved, or even discussed with McGrew what occurred immediately prior to the interrogation, he would have discovered that (as established by the trial and evidentiary hearing) McGrew was in custody and was asked questions by Gallegos for the purpose of eliciting incriminating statements without first being provided *Miranda* warnings. Thus, with minimal investigation—interviewing his client and the officers involved—Bravenec could have determined that the statements were subject to exclusion. *See Miranda,* 384 U.S. at 471-77.

No. 12-50469

**2.**

The majority asserts that, in addition to Gallegos's report, Bravenec also properly relied upon other police reports to make the purportedly strategic decision to decline to move to suppress the incriminating statement. During the evidentiary hearing, Bravenec pointed to Probation Officer Brady's report, suggesting that this report indicated that McGrew denied knowledge of the firearm, consistent with the theory of defense. However, it is doubtful that Brady was even present for the relevant interrogation. At trial, Brady testified that he was not the best person to ask regarding what McGrew and Tutt told the police officers. Rather, Brady's focus was on Chapman, the subject of his probation compliance check. Brady testified that he went to the back of the house to speak with Chapman while McGrew remained in the living room with the police officers. Thus, Brady's report may have only reflected McGrew's initial, voluntary statement, in which he admitted the marijuana was his but denied ownership of the rifle, without any indication as to further statements McGrew made during the hour-long interrogation with the other officers. Bravenec had no sound or informed basis for assuming that Brady's report provided any insight into Gallegos's testimony regarding the hour-long custodial interrogation for which Brady was not present.

Bravenec also testified that his assumptions regarding the meaning of Gallegos's report comported with McGrew's own assertions that he did not know the rifle was under the bed and that he never told the police he had knowledge of the gun. However, the facts McGrew provided to his attorney as he best recalled them, without further investigation, do not provide a sufficient foundation upon which counsel could reasonably discern what Gallegos's report meant; what McGrew might have said while in the custodial interrogation; how Gallegos might have interpreted McGrew's custodial statements; or the nature

19

No. 12-50469

of Gallegos's impending testimony. I fail to see how without any investigation and based upon a faulty assumption that a police officer would testify for the prosecution in accordance with his client's asserted version of events, Bravenec's failure to move to suppress McGrew's inculpatory statement is in any way a reasonable or "tactical" trial strategy.

**3.**

Support for the conclusion that Bravanec's performance fell below the objective standard of reasonable representation is found in the American Bar Association's ("ABA") Standards for Criminal Justice. *See Richards v. Quarterman,* 566 F.3d 553, 564 (5th Cir. 2009) ("In evaluating counsel's performance, the Supreme Court has long referred to the [ABA] Standards for Criminal Justice as 'guides to determining what is reasonable.'" (citing *Rompilla v. Beard,* 545 U.S. 374, 387 (2005)); *see also Wiggins v. Smith,* 539 U.S. 510, 524 (2003); *Strickland,* 466 U.S. at 688. The relevant ABA Standards note:

> [A] well-founded basis for suppression of evidence may lead to a disposition favorable to the client. The basis for evaluation of th[is] possibilit[y] *will be determined by the lawyer's factual investigation for which the accused's own conclusions are not a substitute. . . .* [A]n essential function of the advocate is to make a detached professional appraisal independent of the client's belief that he or she is or is not guilty.

ABA STANDARDS FOR CRIMINAL JUSTICE, DUTY TO INVESTIGATE § 4-4.1 (3d ed. 1993). Bravenec's reliance on an ambiguous police report, which he interpreted in light of his client's assertions that he was not guilty and had not made any statements indicating guilt to the police, fall far below the duty owed to his client, as outlined in the ABA Standards above.

20

No. 12-50469

Moreover, a pretrial suppression hearing is the defense counsel's first opportunity to use the adversarial system to test what is often the prosecution's most damaging evidence of guilt.  Even where counsel is uncertain of the likelihood of success of his suppression motion, a suppression hearing provides the defense attorney with an opportunity to preview the relevant witnesses' testimony, which allows for better trial preparation and competent, zealous advocacy.  If counsel successfully suppresses the evidence, particularly, like here, when the evidence establishes an essential element of the crime, suppression can vastly change the outcome for the defendant. For example, after suppression, the prosecution may decline to prosecute, may offer a favorable plea deal, or even if a trial will follow, the prosecution may have a weaker case against the defendant. To abandon the opportunity to suppress the evidence or hold a suppression hearing thus has substantial and often outcome-determinative consequences for the client.  To provide reasonably adequate representation then, defense counsel must conduct an investigation into the relevant facts and legal basis for suppression before declining to move to suppress.  *See* NATIONAL LEGAL AID & DEFENDER ASSOCIATION ["NLADA"], PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, GUIDELINE 5.1 THE DECISION TO FILE PRETRIAL MOTIONS, *available at* http://www.nlada.org/Defender/Defender_Standards/Performance_Guidelines (last visited Nov. 13, 2013) ("The decision to file pretrial motions should be made *after thorough investigation*, and *after considering the applicable law* in light of the circumstances of each case.") (emphasis added); *see also House v. Balkcom,* 725 F.2d 608, 618 (11th Cir. 1984) ("Pretrial investigation . . . is, perhaps, the most critical stage of lawyer's preparation."). As the Supreme Court explained, "counsel

21

has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91. Thus, defense counsel's significant opportunity to obtain a favorable outcome for his client in the pretrial motion to suppress compels recognition that, in this context, "[a] reasonable attorney has an obligation to research relevant facts and law, or make an *informed* decision that certain avenues will not prove fruitful." *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999) (emphasis added). As the Sixth Circuit has persuasively noted, "[c]onstitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of 'strategy'—based on what investigation reveals witnesses will actually testify to, *not based on what counsel guesses they might say in the absence of a full investigation.*" *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007) (emphasis added). In light of the ABA and NLADA Standards, as well as Supreme Court and circuit case law emphasizing the importance of an attorney's duty to investigate, Bravenec's decision to decline to suppress an unconstitutionally obtained statement on an *assumption* that a police officer called by the prosecution would testify in the defense's favor cannot reasonably be interpreted as a "strategic, conscious, [or] informed" decision. *Cavitt*, 550 F.3d at 440.

**4.**

Despite the lack of investigation or research, the majority contends that Bravenec's decision was strategic and that any resulting harm caused by his merely "risky" strategy, *see* Maj. Op. *ante* at 9, was mitigated by Bravenec's cross-examination of Officer Gallegos and thus was not "so ill chosen that it permeate[d] the entire trial with obvious unfairness." *Dretke,* 404 F.3d at 885 (quoting *Jones,* 287 F.3d at 331). The majority reasons that on cross-examination, Bravenec

elicited testimony from Gallegos that "the officers had not questioned McGrew about the rifle before showing it to him and conceded that '[o]nly after he had seen the gun did he say, oh, that must be Mr. Tutt's.'" *See* Maj. Op. *ante* at 9. In isolation, this statement arguably supports the theory of defense; however, the majority fails to explain that Gallegos never backtracked from his initial testimony on direct examination that McGrew admitted that he knew the gun was there. A close review of the cross-examination in its entirety reveals that the cross-examination cannot fairly be read as a cure to Bravenec's failure to suppress the statement and in fact allowed Gallegos to *further highlight and reaffirm* McGrew's inculpatory, unconstitutionally procured statement. To demonstrate, the following testimony from Bravenec's cross-examination of Gallegos cannot reasonably be interpreted as favorable to the defense:

> Q: [McGrew] also told you that he didn't know what Mr. Tutt had brought over.
>
> A: In the safe. *He acknowledged him knowing bringing over the weapon and that the weapon was under the bed*. He just said he didn't know what was in the *safe*.
>
> . . .
>
> Q: . . . [Y]ou don't know what Mr. McGrew did or did not see and what he did or did not see when it was brought over, if it was brought over on the 29th? Right?
>
> A: That is correct.

No. 12-50469

Q: So, what you are just going on is based on your examination of the scene and based on your common experiences as a police officer. Right?

A: *And, what Mr. McGrew told me.*

Q: Okay. And, by his own admittance here he says, "oh, that must have been what Mr. Tutt brought over but I didn't know what that was." Correct?

A: Yes, sir . . . *Part of the answer*, yes, sir.

(Emphasis added). As Gallegos implied on cross-examination, the statement that the majority points to is only *part* of McGrew's statement and does not necessarily negate McGrew's actual knowledge of the firearm. Further, on redirect, Gallegos again testified that McGrew stated that Tutt brought over a small safe and the weapon inside a blue sleeve, implying that McGrew had knowledge of what was being brought to the home and merely did not know the contents of the *safe*.

### 5.

In our adversarial system, a pretrial suppression hearing may be the best opportunity for the defense to test the prosecution's case. Thus, before declining to seek suppression of incriminating evidence, reasonably effective counsel must conduct an investigation into the facts and legal bases for suppression, and may not reasonably rely on an assumption or guess. Otherwise, "[s]uch a complete lack of pretrial preparation puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution, and the reliability of the adversarial testing process." *Kimmelman*, 477 U.S. at 385 (quotation marks and

24

citations omitted). Bravenec's abandonment of the opportunity to suppress incriminating, unconstitutionally procured evidence without investigation or research, and based instead on an illogical assumption, fell far below the objective standard of reasonableness and constitutes deficient representation under the first *Strickland* prong.

## B.

Under *Strickland's* second-prong, McGrew must establish "that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687. Specifically, McGrew "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A review of the record indicates that, but for counsel's objectively unreasonable failure to move to suppress McGrew's incriminating, unconstitutionally elicited statement, there is a reasonable probability that there would have been a different outcome, thus undermining confidence in the conviction. The result of Bravenec's deficiency was that Officer Gallegos was able to testify that McGrew explicitly admitted what was essentially the only element of the crime in dispute. In McGrew's appeal of the district court's initial denial of his motion for relief pursuant to 28 U.S.C. § 2255, a unanimous panel described McGrew's statement as having a "devastating impact" on the case and reasoned that, "[a]lthough the government introduced other evidence at trial supporting the inference that McGrew had knowledge of the rifle, no evidence was as damaging as McGrew's admission." *United States v. McGrew,* 397 F. App'x 87, 94 (5th Cir.

2010) (unpublished) (remanding the case for the evidentiary hearing regarding McGrew's Fifth Amendment and ineffective-assistance-of-trial-counsel claim). That panel noted that "McGrew's admission was certainly probative evidence of his guilt," and recognized the inherently damaging nature of a defendant's admission, citing *United States v. Avants,* 278 F.3d 510, 522 (5th Cir. 2002) (the defendant's confession is "powerful evidence of guilt, the admission or exclusion of which would be highly likely to affect the outcome of the trial"), and *Pyles v. Johnson,* 136 F.3d 986, 996 (5th Cir. 1998) (a confession is "probably the most probative and damaging evidence" against the defendant). Significantly, the panel stated that, "[a]ssuming that a motion to suppress would have been successful," which after an evidentiary hearing, we now know it would have been, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *McGrew,* 397 F. App'x at 94 (quoting *United States v. Rosalez-Orozco,* 8 F.3d 198, 199 (5th Cir. 1994)). As a panel of this court has already indicated, McGrew's trial was prejudiced by counsel's deficient failure to move to suppress his unconstitutionally obtained, incriminating, inadmissible statement, and consequently McGrew was "deprive[d] . . . of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687.

## IV.

Because McGrew has established both the deficiency and prejudice prongs of the *Strickland* standard, he has overcome the procedural default. Accordingly, I respectfully dissent.